TURNER WILLIAMS, MAURICE WILLIAMS AND JACOB HARGROVE, *Plaintiffs in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

1.  An assignment of error in the following language: "For errors apparent by an examination of the record," presents nothing for consideration by an appellate court.

2.  A single assignment of error attacking a plurality of rulings of the trial court, whether upon the pleadings, the admission or rejection of evidence, or the granting or refusal of instructions to the jury, will be unavailing, unless all of such rulings so grouped *en massee* are erroneous, and the determination by an appellate court that one of the rulings so attacked is correct disposes of the assignment.

3.  In preparing assignments of error each error relied upon should be clearly and distinctly specified and separately assigned.

4.  The declaration or exclamation of a person who had been shot, within the space of two minutes after the firing of such shot and just prior to his death, which ensued almost immediately from the wound so inflicted upon him, "Oh Lordy, Turner Williams shot me," is admissible in evidence as part of the *res gestae* in a prosecution for murder against the person so named by such deceased person.

5. Objections to the admissibility of evidence must, as a general thing, be made when it is offered, or its admissibility cannot be assigned as error. In a criminal prosecution an objection to a question after it had been answered comes too late.

6. In passing upon an assignment questioning the correctness of the ruling of the trial court in denying a motion for a new trial, which is based upon the sufficiency of the evidence to sustain the verdict, the guiding principle for an appellate court is not what it may think the jury ought to have done, or what such court may think it would have done had it been sitting as a jury in the case, but whether as reasonable men the jury could have found such verdict from the evidence adduced. If this question can be answered in the affirmative, the action of the trial court upon such motion should not be disturbed.

7. The verdict of a jury should be conformable to legal rules and defensible in point of sense. It must not be absurd or whimsical. But an appellate court is not warranted in substituting its standard of what is reasonable for that of the jury. If reasonable men might have found the verdict in question, and it has received the sanction of the trial court, an appellate court should not disturb it.

8. The refusal of the trial court to grant a new trial for insufficiency of the evidence to sustain the verdict, or because the verdict is contrary to the evidence, will not be reversed unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the appellate court that it is wrong and unjust.

9. When the trial court concurs in the verdict rendered by a jury by denying the motion for a new trial, and there is evidence to support it, an appellate court should refuse to disturb it, in the absence of any showing that the jurors must have been improperly influenced by considerations outside the evidence.

10. In criminal cases, especially in felony, where the penalty is severe, in passing upon an assignment based upon the denial of the motion for a new trial, which is based upon the suffi-

ciency of the evidence to sustain the verdict, an appellate court will weigh the evidence, and where, in its opinion, it preponderates so strongly against the verdict that it cannot conclude such verdict was founded upon the evidence adduced by the State, no evidence having been introduced by the defendants, the judgment of conviction will be reversed and the case remanded for a new trial.

11. In a prosecution for murder in the first degree against three defendants, which resulted in their conviction, one being named in the verdict as principal and the other two as accessories thereto before the fact, in passing upon an assignment based upon the denial of the motion for a new trial, which questioned the sufficiency of the evidence to sustain the verdict, when an appellate court, in weighing all the evidence adduced, cannot find the evidence upon which such verdict as to the two defendants convicted as accessories could have reasonably been predicated and is impelled to the conclusion that as to such two defendants the jury must have been improperly influenced by considerations outside the evidence, and where the evidence against the defendant convicted as principal is not clear, but in many respects is unsatisfactory, it should declare the verdict vitiated and tainted as to all three of the defendants, reverse the judgment of conviction and remand the case for a new trial.

This case was decided by Division A.

Writ of Error to the Circuit Court for Wakulla County.

'The facts in the case are stated in the opinion of the court.

*Wm. C. Hodges* and *W. H. Ellis,* for Plaintiff in Error.

*Park Trammell,* Attorney General, for the State.

SHACKLEFORD, J.—The plaintiffs in error were convicted of murder in the first degree, with a recommenda-

tion to the mercy of the court, Turner Williams as principal and Maurice Williams and Jacob Hargrove as accessories thereto before the fact. All of such defendants were sentenced to confinement in the State prison for the period of their natural lives. Relief is sought here upon writ of error.

Nine errors are assigned, but the fifth, sixth and seventh, all of which are based upon the refusal of certain requested instructions, are not argued, not even being mentioned by the defendants in their brief, hence must be treated as abandoned. The ninth assignment is "For errors apparent by an examination of the record." This assignment is not argued and presents nothing for consideration. See Douberly v. State, 51 Fla. 41, 40 South. Rep. 675.

The first assignment questions the sufficiency of the evidence to support the verdict, and the second and third assignments are to the effect that the verdict is contrary to the charge of the court and to the law. We pass these assignments temporarily but shall take them up for consideration presently. The fourth assignment is as follows:

"Because the court erred in admitting the testimony of the witness Frank Thomas, Alex Franklin, John Henry Franklin, Mary Jane Franklin and Lucius Bryant, or the testimony of any one of them, as to that particular part of the testimony wherein they testified to hearing alleged dying exclamations of the deceased as follows: 'Oh, Lord, Turner shot me.' "

It will be observed that this assignment is based upon different rulings of the trial court in admitting the testimony of several witnesses as to the "alleged dying exclamations of the deceased as follows: 'Oh Lord, Turner shot me.' " When we turn to the bill of exceptions and examine the testimony of these several witnesses upon the point in question, we find that objections were interposed

to certain portions thereof and also motions made to strike out designated parts. All of these different rulings were severally excepted to and it is attempted to group them all *en masse* in one assignment. This is a very unsafe practice, to say the least of it, though we do not feel called upon, in the absence of any point being made, to enter into any extended discussion. Suffice it to say that this court has several times called attention to the necessity for particularity in the assignments of error. See Atlantic Coast Line R. R. Co. v. Crosby, 53 Fla. 400, 43 South. Rep. 318, and authorities there cited. Also see Daniel v. Siegel-Cooper Co., 54 Fla., 265, 44 South. Rep. 949. In line with our repeated holding that a single assignment predicated upon the refusal to give two or more requested instructions containing separate propositions of law must fail if it appears that any one was properly refused, it would seem that a single assignment attacking a plurality of rulings upon the admission or rejection of evidence would be unavailing unless all of such rulings were erroneous. See Vaughan's Seed Store v. Stringfellow, 56 Fla. 708; 48 South. Rep. 410. See generally Seaboard Air Line Ry Co. v. Hubbard, 142 Ala. 546; 38 South. Rep. 750.

The testimony is set out in the bill of exceptions in narrative form. We find disclosed therein that a negro "festival" was being held on the night the tragedy was enacted which resulted in the death of Henry Franklin and in the defendants being indicted and tried for murder. Frank Thomas was the first witness introduced on behalf of the State and, after having testified that he was acquainted with both the deceased and the three defendants and that he attended such "festival," further testified: "We heard a shot and Franklin ran inside the gate and said, 'Oh, Lordy, I am shot, that boy Turner Williams shot me.' Then I ran to him and said 'Who shot you?'

and he said————." Before he finished the sentence, the bill of exceptions recites: "Thereupon the attorney for the defendants objected to the testimony of the said witness as to who shot him upon the ground that the same was not part of the *res gestae,* and secondly that no predicate had been laid for the introduction of dying declarations, but the said judge did then and there deliver his opinion and decide that the objection ought not to be allowed, and permitted the witness to testify on the ground that such statement of the said witness was part of the *res gestae,* to which said opinion and decision the attorney for the said defendants in their behalf did then and there except." The witness then completed the interrupted sentence by saying, "Oh Lordy, Turner Williams shot me." As we have already said, the questions propounded to the respective witnesses and their answers thereto are not given, the testimony being set out in narrative form. As appears from the bill of exceptions, the witness had already given the exclamation or declaration of the deceased as to who shot him before any objection was interposed thereto, and, after the overruling of the objection which was made later, simply repeated such exclamation or declaration. As we held in Schley v. State, 48 Fla., 53; 37 South. Rep. 518, "Objections to the admissibility of evidence must, as a general thing, be made when it is offered, or its admissibility cannot be assigned as error. In a criminal prosecution an objection to a question after it has been answered comes too late." No motion was made to strike out any portion of the testimony of this witness. As we held in Dickens v. State, 50 Fla., 17, 38 South. Rep. 909, "Where an answer to a question presents evidence which is illegal or objectionable on any known ground, the proper practice is a motion to strike it out and have the jury directed not to consider it, the movant specifying his objections to the

evidence with like particularity as in objecting to questions." The witness goes on to testify that the deceased "was shot with a shot gun just outside the gate about six or eight feet and ran inside the gate and to the house, which is about thirty feet away from the gate, and died." He further testified that "immediately after the gun fired the exclamation was made."

Aleck Franklin testified that the deceased was his father, that he was present on the night that his father came to his death, that he heard only one shot "fired at the frolic" that night, upon which he looked around as quickly as he could and saw his father outside the gate. The witness proceeded to testify, "As soon as he was shot he fell down and then jumped up and hollered and said, ——". Here was promptly interposed a like objection to that offered to the testimony of Frank Thomas, which we copied above and, upon the same being overruled for like reasons, the witness proceeded to complete the sentence, saying that his father exclaimed, "Oh Lordy, Turner Williams shot me," adding that the deceased "then ran inside of the gate and said, 'Oh Lordy, Turner Williams shot me,' and then ran to the house and said, 'Oh Lordy, Turner Williams shot me,' and fell down and died. It was right after the gun fired, about two minutes I reckon, when he said who shot him. It was right after the gun fired." The defendants moved to strike out that part of the testimony of the witness as to the exclamation or declaration of the deceased as to who shot him, on the grounds that same was not part of the *res gestae* and was also hearsay testimony. This motion was denied by the court.

Like testimony was given upon the point in question by John Henry Franklin and Mary Jane Franklin, and like objections and like motions were made by the defendants with like rulings by the court. We do not find in the bill

of exceptions any testimony given by Lucius Bryant as to any exclamation or declaration made by the deceased as to who shot him, or, indeed, as to any statement of any kind made by the deceased.

Even if we pass the irregularities which we have pointed out and consider this assignment on its merits, no error upon the part of the trial court has been made to appear to us either in overruling the objections to such testimony or in refusing to strike it out. Under the rulings of this court, we are clear that such exclamation or declaration of the deceased as to who shot him taken in connection with the attendant circumstances, was properly held to constitute part of the *res gestae.* See Lambright v. State, 34 Fla., 564, 16 South. Rep. 582, and Marlow v. State, 49 Fla., 7, 38 South. Rep. 653. The facts and circumstances of this case distinguish it from Vickery v. State, 50 Fla., 144, 38 South. Rep. 907. Also see 1 Bishop's New Crim. Proc. Sec. 1086, and authorities cited in notes.

The eighth assignment is as follows:

"Because the court erred in refusing to charge the jury as follows: 'I charge you that before you are warranted in finding Turner Williams guilty, you must believe from the evidence beyond a reasonable doubt that he, Turner Williams, fired the fatal shot and that none other than Turner Williams could have shot Franklin, and if you believe that it was reasonable that some other person than Turner Williams could have fired the fatal shot, then you should acquit the defendant, Turner Williams.' "

We are of the opinion that no error is made to appear here. It is by no means very happily worded, but is confusing and well calculated to mislead the jury. It is not strenuously insisted upon here and no authorities are cited to us in support of this assignment. We find from an inspection of the general charge that it fully covered the proposition of law embraced in the requested and re-

10—Vol. 58.

fused instruction, in-so-far as such instruction stated the
law correctly, therefore it was properly refused. See Bass
v. State, decided here at the present term, and authorities
therein cited.

We now take up the first three assignments, which we
temporarily passed. Was the evidence adduced sufficient
to support the verdict? The jury evidently thought so,
and the trial judge concurred in their finding by over-
ruling the motion for a new trial and refusing to disturb
the verdict. Under such circumstances, this court is dis-
inclined to interfere with the verdict or to reverse the
judgment rendered thereon. Its policy has been declared
in a long line of decisions. See McNish v. State, 47 Fla.,
69, 36 South. Rep., 176, and cases there cited. A number
of cases to the same effect have been rendered by this
court since the opinion in the cited case was handed down.
In other words, this court will refuse to disturb a verdict,
especially where it has been approved by the trial judge,
where there is evidence to support it. The mere fact that
the evidence was conflicting will not suffice. Also see the
reasoning in Wilson v. Jernigan, 57 Fla. 277, 49 South.
Rep. 44, which we shall not repeat here. On the other
hand, it was held in Green v. State, 17 Fla. 669, which
ruling has been followed in subsequent cases, that "In
criminal cases, especially in felony, where the penalty is
severe, the court will weigh the evidence, and where, in
its opinion, it preponderates so strongly against the ver-
dict that it cannot conclude such verdict was founded
upon the evidence on the part of the State, no testimony
having been introduced on the part of the defendant, a
new trial will be granted." In the instant case the de-
fendants introduced no testimony. Also see Rushton v.
State, Graham v. State, and Stewart v. State, all decided
here at the present term.

With these guiding principles before us, we turn now

to a consideration of the testimony adduced at the trial. We have already had occasion to refer to and set forth the testimony of the different witnesses concerning the exclamation or declaration made by the deceased as to who shot him, and have held that such exclamation formed part of the *res gestae* and was properly admitted as such, consequently we shall not repeat such portions of the testimony.

Frank Thomas, the first witness introduced on behalf of the State, further testified that at the time he heard the shot fired which killed the deceased he was standing at the door with Maurice Williams, one of the defendants, and other named persons; that Maurice Williams did not have any shot gun with him but had a small rifle which was broken; that he did not see Turner Williams there that night; that the deceased was shot with a shot gun. He further testified: "I met Jack Hargrove about a quarter of a mile from the place where the festival was held later that night. He was going to the festival with Willie Williams, who is sometimes called 'Madison' Williams, but when they heard that somebody had been killed at the festival they turned back and Jake stopped in his mother's house a few minutes, while his companion waited outside, and then they both went to Jake's house." The witness further testified "that when deceased was shot he was standing about 4 or 6 feet from the gate."

Aleck Franklin, the second witness introduced on behalf of the State, testified as follows: "Henry Franklin was my daddy and who was shot on the 19th day of December, 1908, at a frolic at Ned Acre's house in Wakulla county, Florida. He was shot in the left breast. Turner Williams shot him. I did not see him shoot him. I did not see him there that night but I saw Morris (Maurice) there and Capus and their sister Lucy. I heard Maurice say, 'We are going to get us a nigger' and I asked Where

is Turner, and he said, Turner is coming.' I did not see either of these have a gun, except Morris had a little rifle which I had borrowed from him and which I returned to him that night at the frolic. It was broken. Father was shot with a breech-loaded shot gun one time. I only heard one shot fired at the frolic. There was drinking going on there. I was standing on the porch and my father told me there was drinking going on and I had better look out that no trouble occurred, and then he walked to the gate and before I could walk from here to the corner of the courthouse, he was shot. I looked around as quickly as I could. I thought Rube Gavin fired the gun because Rube had been drinking, but I saw Rube standing near and he didn't have a gun. I then looked at my father who was just outside the gate, but I could not see anybody else."

After going on to testify as to the exclamation made by the deceased as to who shot him, to which we have previously referred, the witness proceeds: "My daddy, Henry Franklin, & Turner & Morris Williams met in the road that night and had a row. I did not know Morris when I saw him there at first, because he had on Turner's hat, but later in the evening I saw him again with his own cap on. I first thought it was Turner, but when he spoke I recognized his voice."

The next witness introduced by the State was John Henry Franklin, who testified as follows: "I only saw Morris and Capus at the frolic at which my father was killed. I asked Maurice where Turner is at. He said Turner is coming. The frolic was in Wakulla county, Florida, and occurred on the 19th day of December, 1908. I do not know where Morris and Capus were when the gun fired. I did not see them then. I did not see Turner there at all. There was some shooting at the frolic

sometime before that and some drinking, but I did not know who did the shooting."

Omitting his testimony as to the exclamation made by the deceased, the witness proceeded with his testimony: "There never had been any trouble between Turner and the other defendants and my father that I know of, except about some hogs and that trouble was between my father and their mother and they were having some words about it about two weeks before this and Turner said, 'Mama, why don't you go along and let the old man alone. If you don't you will make me do something to hurt him, damn his old soul;" then he turned to his little sister Pauline and told her to go up to Jenkins Hick's and buy him a shell, that he wanted to kill a hawk. A short time afterward I saw him walking out in the field back of our barn with his gun. He didn't say anything, but he would stop as if he looking for somebody. He stayed there a little while and then he went away. He and his mother live on the same plantation that my father lived on, and we were all close neighbors."

Mary Jane Franklin testified as follows:

"I was the wife of Henry Franklin. He was killed December 19th, 1908, in Wakulla county, Florida, at a frolic at Ned Acree's house. He was shot in the left breast with a breech-loaded shot gun. He lived only a few minutes after he was shot. I heard him speak after he was shot. I was in the house, but he was in the yard. I did not see who shot him. I did not see Turner Williams at the frolic at all and Jake Hargrove was not there. I saw Maurice Williams and Capus Williams there. Maurice Williams had a rifle which my son had borrowed from him and gave back to him at the frolic that night. It was broken." "I was present when the mother of these boys and my husband had a quarrel about some hogs and I heard Turner tell her to go on and let the old man alone

or she would make him hurt him, damn his old soul. Then he sent his little sister up to buy a shell and said he wanted to kill a hawk with it, and a short time afterward I saw him walking in the field back of the barn. He didn't say anything and didn't stay very long, he had a gun with him."

Lucius Bryant simply testified to the effect that he helped to bury the deceased, who met his death at a frolic at Ned Acree's house December 19th, 1908, in Wakulla county, Florida, being shot in the left breast with a shot gun, the hole being large enough for witness to put his hand in.

James Smith gave the following testimony:

"I am sheriff of Wakulla county, Florida. I was informed of the killing of Henry Franklin out at Ned Acree's house sometime during the night. I went to Turner Williams' house and went in. His mother told me Morris and Capus were in bed, but that Turner had not got in yet. I found Morris and Capus lying on a pallet on the floor in front of the door and when I turned the cover down I found Turner in bed with them also. He was covered up head and ears. I found a shot gun there. The barrel looked bright as if it had been recently wiped out and I also found the rag on the floor that had been used in wiping it out. The rag felt damp. The breech of the gun was cold though and was practically bright and dry. 'I also then made a search for some other gun, but could not find any. Morris told me that Henry Taylor had loaned a gun to them and that it was back of the bed, but I could not find it and have never been able to find it. I also examined the place where Henry Franklin was killed. There was an oak tree standing about eight feet from the gate. There were tracks by this oak tree and the wadding of a gun with blood on the wadding where Franklin had been shot, outside of the gate. It

appeared as if the gun had been pushed so close to him that it almost touched him. The gate is about thirty feet from the house. When Turner dressed and put on his shoes there was damp sand on them."

Willie Williams, sometimes called Madison Williams, testified as follows:

"I was with Jacob Hargrove down in a neighborhood called 'The Rocks' on December 19th, 1908. We went down there early in the day and did not leave there until after night. We started back from the rocks to Ned Acree's place to go to the frolic, but on the road to the frolic a man came dodging through the bushes and called Jacob to him, calling Jacob 'Buddie' and I heard him say, 'If anybody asks if I was at the frolic, tell them I was at home asleep for I have killed old man Franklin.' I could not tell who this was or whether he was a black man or a white man. Turner Williams called Jake Hargrove 'Buddie.' Also Capus Williams and Maurice Williams called Jacob 'Buddie.'"

The last witness introduced by the State, Anthony Hicks, testified thus: "I had a conversation with Jake Hargrove three days before Franklin was killed. We were walking along the road together. There were some other parties with us, but I do not think they were in hearing distance. I told him that he was the oldest one and the head of the family of the boys and should be a peace-maker and not do anything with old man Franklin, and that he should go to Franklin and make peace, and not hurt him, and he said 'I won't do anything of the kind. He has been meddling with the folks and we will make way with him, the damn old son-of-a-bitch.'" At the close of his testimony, the State rested its case and the defendant announcing that they would offer no testimony, the court then proceeded to charge the jury. After carefully weighing the evidence, we are irresistibly im-

pelled to the conclusion that there was not sufficient evidence adduced to warrant the verdict of the jury that the two defendants, Jake Hargrove and Maurice Williams, were guilty of the murder of Henry Franklin as accessories thereto before the fact.   We cannot find the evidence upon which such verdict could have been reasonably predicated.   This being true, it necessarily follows that the jury must have been influenced by considerations outside the evidence.   Having reached such conclusion, as reluctant as we are to interfere with the verdicts of juries in which the trial court has concurred, the judgment must be reversed as to such two defendants.   In addition to the authorities previously cited, see Williams v. State, 20 Fla., 391;   Small v. State, 20 Fla., 780;   Armstrong v. State, 30 Fla., 170, 11 South. Rep. 618, S. C. 17 L. R. A. 484;   Whetson v. State, 31 Fla., 240, 12 South. Rep. 661;   Baker v. State, 54 Fla., 12, 44 South. Rep. 719.   We would also refer to 1 Bishop's New Criminal Procedure, section 1278, and authorities cited in the notes thereto.

A still more serious question confronts us in regard to the conviction of Turner Williams, the principal.   While the evidence adduced against him is by no means as convincing as we would like, and in many respects is unsatisfactory, if he were the only defendant we would hesitate long before we would disturb the verdict.   Having reached the conclusion, however, that the jury must have been influenced by considerations outside the evidence in finding their verdict against his co-defendants, we cannot get our consent to let the verdict stand as to him.   We feel that the ends of justice will be better met by reversing the judgment as to all three of the defendants and remanding the case for a new trial.   In view of

the conclusion reached, we have refrained from commenting on the testimony in detail.

Judgment reversed.

WHITFIELD, C. J., and COCKRELL, J., concur.

TAYLOR, HOCKER and PARKHILL, JJ., concur in the opinion.