LOUIS NIMS, ALIAS CHIP NIMS, *Plaintiff in Error, v.* THE STATE OF FLORIDA, *Defendant in Error.*

### Opinion filed Dec. 16, 1915.

CRIMINAL LAW—MURDER—IDENTITY OF ACCUSED AS BEING THE OFFENDER.

In a conviction for murder in the first degree, where the evidence as to the identity of the accused as being the guilty party is not satisfactory, a new trial should be granted. Platt v. State, 65 Fla. 253, 61 South. Rep. 502. (SHACKLEFORD and COCKRELL, JJ., *dissent.*)

Writ of error to Circuit Court, Leon County; E. C. Love, Judge.

Judgment reversed.

*John W. Henderson* and *Fred T. Myers,* for Plaintiff in Error.

*T. F. West,* Attorney General, and *C. O. Andrews,* Assistant, for the State.

TAYLOR, C. J.—The plaintiff in error, Louis Nims, hereafter referred to as the defendant, a colored man, was indicted for and tried and convicted of, the crime of murder in the first degree, the jury in their verdict recommending mercy, and was sentenced to imprisonment for life in the State penitentiary, in the Circuit Court of Leon County, and by writ of error brings such judgment here for review.

But one assignment of error is presented here, and that is that the court below erred in denying the defend-

ant's motion for new trial upon the ground therein that the verdict was contrary to the law and the evidence. Upon a careful consideration of the evidence brought here in the transcript we are impelled to the conclusion that this assignment is well taken, which necessitates the reversal of the judgment of conviction, and the grant of a new trial. A detailed discussion of the evidence is unnecessary, and, in view of the grant of a new trial, may be improper. We shall, therefore, discuss only such salient features of the case as presented by the facts that have impelled us to the conclusion at which we have arrived. The deceased, Willie Hinton, also a colored man, was shot in the back in the City of Tallahassee, on the night of February 23rd, 1915, with a single pistol ball that penetrated his right lung and liver lodging just under the skin on his right side, from which wound he died two or three days afterwards.

For a conviction the State relied in large measure upon what purports to be the *ante mortem* statement of the deceased. This statement is in some respects remarkable. As detailed by the witnesses testifying to it, the deceased was walking first along St. Augustine street and then down Gay street passing near the defendant's house, that as he passed the defendant's house he saw the hack or carriage of the defendant with two horses hitched to it standing near the defendant's house with the defendant in the hack, and that the defendant got out of the hack and followed along after him down Gay street until he reached the point where he was shot. That he knew it was the defendant who was following him in the street, before he shot him. That the defendant came up behind him and shot him in the back. That immediately upon being shot he, the deceased, first pulled out of his pocket

a hand electric flash light, wheeled around and flashed this light in the fact of the defendant, then recognizing him to be the defendant. That he, the deceased, then drew his own pistol and chased the defendant, who ran off, until he got so weak from his wound he could go no farther, firing three times at the defendant as he ran off. This statement was accompanied to one of the witnesses who detailed it, with expressions from the deceased that evinced considerable spite and vindictiveness on his part towards the defendant. This witness who was a deputy sheriff, stated that at the time the statement was made to him the deceased insisted that the defendant should not be turned loose or out of jail, as he was sure that he was the party who shot him, and insisted upon the defendant being kept in jail. These utterances of the deceased evincing as they did a spirit of vindictiveness on his part towards the defendant, were well calculated to strip such statement of much of its force as credible evidence. The credibility of this statement by the deceased, is further seriously shaken by the testimony of one Mrs. Hartsfield, an entirely disinterested and unbiased witness, who testified that the house in which she lived was just across a street about sixty feet in width almost directly in front of the defendant's house on St. Augustine street. That she was standing in her front door looking for her little son whom she had sent out on an errand. That the night was a slightly clouded moonlight night, and that she could see plainly the defendant's house and any object near or around it, such as a hack and horses. That she stood in her front door for some time prior to the firing of the shots, and until the shots were fired, when she on hearing them retired into her house. And that there was no hack or carriage anywhere about the defendant's house at the

time of or before said shots were fired, nor for some time afterwards. And again this *ante mortem* statement of the deceased is strongly shaken, if not overwhelmingly impeached by the testimony of eight or ten apparently disinterested witnesses, all of whom testified in substance that the defendant with his horses and hack was standing in the street in front of the Daffin Theatre, about a mile from where the deceased was shot, at the time of, and before the shooting, and afterwards went into the theatre and attended a minstrel performance exhibiting there on that night, and was arrested by the sheriff as he sat in the theatre. Another feature of the proofs apparently relied upon by the prosecution was an alleged confession by the defendant made in the hearing of a fellow prisoner in the jail after his arrest. Unfortunatly for the credibility of the witness put on to prove this alleged confession, he stated that it was sung out aloud so that everybody in or about the jail, even the jailor's wife, could have heard it, and yet neither the jailor's wife nor any other of the many occupants of the jail at the time were put on the witness stand to bolster up or corroborate this lone jail bird in his story of a confession, that he says was shouted out to the world at large, and that it was made in response to a question put to the defendant by another occupant of the jail, and yet such named questioner was not put on the stand to bolster up said alleged confession.

Another feature of the case impelling us to the conclusion at which we have arrived, is the recommendation to mercy by the jury in their verdict. The deceased was killed by some assassin in cold blood, and if this defendant was in fact guilty of it, there were no circumstances that called for or justified an extension of mercy, unless it was incorpoarted into the verdict as a safeguard against

the prickings of the jurors'. consciences in case they condemned the defendant to death, in the presence of the testimony of the cloud of disinterested witnesses who swore in effect that the defendant was elsewhere at the time of the homicide, and therefore could not be guilty of it, when such testimony was sufficient, to say the least of it, to engender in the minds of any fair minded jury a gravely reasonable doubt as to the guilt of the defendant.

In view of the entire evidence bearing on the identity of the plaintiff in error as being the perpetrator of the homicide, we are of the opinion that a new trial be awarded.    Platt v. State, 65 Fla. 253, 61 South. Rep. 502.

The judgment of the court below is hereby reversed at the cost of Leon County, and a new trial ordered.

WHITFIELD and ELLIS, JJ., concur.

SHACKLEFORD and COCKRELL, JJ., dissent.

SHACKLEFORD, J., (*dissenting*).—I regret exceedingly my inability to concur in the opinion prepared by the Chief Justice.    It is true that sharp conflicts exist in the testimony upon material points, but, as we held in McClellan v. State, 66 Fla. 215, 63 South. Fla. 419, following prior decisions of this court, "While the legal effect of evidence or the lack of evidence in its relation to a verdict rendered in a trial, may by appropriate proceedings be reviewed by an appellate court, yet conflicts in competent testimony, the weight of legal evidence and the credibility of competent witnesses are primarily for the determination of the jury; and where there is some substantial competent evidence of all the facts legally es-

sential to support the verdict, and there is nothing in the record to indicate that the jury were not governed by the evidence, a refusal of the trial court to grant a new trial on the ground of the insufficiency of the evidence to sustain the verdict will not be disturbed by the appellate court." Also see McDonald v. State, 56 Fla. 74, 47 South. Rep. 485, and Smith v. State, 66 Fla. 135, 63 South. Rep. 138. In Williams v. State, 58 Fla. 138, 50 South. Rep. 749, we announced the following principles, which we have subsequently followed:

"In passing upon an assignment questioning the correctness of the ruling of the trial court in denying a motion for a new trial, which is based upon the sufficiency of the evidence to sustain the verdict, the guiding principle for an appellate court is not what it may think the jury ought to have done, or what such court may think it would have done had it been sitting as a jury in the case, but whether as reasonable men the jury could have found such verdict from the evidence adduced. If this question can be answered in the affirmative, the action of the trial court upon such motion should not be disturbed.

The verdict of the jury should be conformable to legal rules and defensible in point of sense. It must not be absurd or whimsical. But an appellate court is not warranted in substituting its standard of what is reasonable for that of the jury. If reasonable men might have found the verdict in question, and it has received the sanction of the trial court, an appellate court should not disturb it.

The refusal of the trial court to grant a new trial for insufficiency of the evidence to sustain the verdict, or because the verdict is contrary to the evidence, will not be reversed unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence

against the verdict is so decided as to clearly convince the appellate court that it is wrong and unjust.

When the trial court concurs in the verdict rendered by a jury by denying the motion for a new trial, and there is evidence to support it, an appellate court should refuse to disturb it, in the absence of any showing that the jurors must have been improperly influenced by considerations outside the evidence."

As I read the transcript of the record, I find ample evidence to sustain the verdict, and I cannot say that the jurors must have been improperly influenced by the considerations outside the evidence.

COCKRELL, J., concurs in this dissent.