WILLIAM TROOP, CHARLES STEVENS, and HOWARD SHAFFER, *Plaintiffs in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Division B.

Opinion filed August 1, 1929.

· *Sam Wilson, Lee Booth* and *Edgar Waybright,* for Plaintiff in Error;

*Fred H. Davis,* Attorney General, and *Roy Campbell,* Assistant, for the State.

STRUM, J.—Plaintiffs in error, who will hereafter be referred to as the defendants, were convicted of murder in the first degree, without recommendation to mercy, for the killing of Mary McMillan. The trial judge granted a new trial. Upon a second trial defendants were again convicted and sentenced to death. It is to the latter judgment that this writ of error is prosecuted.

In this court, the argument of the State for affirmance and of the defendants for reversal is addressed principally to the sufficiency of the evidence to establish the identity of these defendants as the perpetrators of the crime, the question of identity being the essential issue here presented.

The evidence in the case is lengthy, and in many essentials unique. The possibility of the occurrence of another case involving substantially the same state of facts as is here involved is too remote to justify an extended review of the evidence in its entirety. Brief reference will be made, however, to certain phases of the evidence relating to the question of identity.

The homicide occurred in the western portion of the City of Jacksonville at about daybreak on the morning of Sunday, August 1, 1926. The deceased was murdered in a most brutal manner, apparently with an axe. She was residing in a home with her husband Malcolm McMillan. So far as the record disclosed, there were no eye witnesses to the actual slaying of Mary McMillan. Her husband, testified, however, that when he awoke at about daybreak on the morning in question he went out upon the back porch of his home to get a drink of water, when he was attacked by three men whom he identified at the trial as these defendants. McMillan further testified that his assailants inflicted severe injuries upon him with an axe, cutting him in the back, in the head, and breaking his arm, but that he escaped from them and crawled under the house where he was found shortly afterward by neighbors. McMillan further testified that one of these defendants whom he recognized as Charles Stevens peeped under the house at him, after which he heard the three defendants proceed into the house and to the room where his wife was sleeping. Immediately thereafter he heard his wife scream and run out into the front yard. She was found there a few minutes later by neighbors who heard the noise of the encounter and came to investigate. Besides other wounds, her head had been split open apparently with an axe which was found close by her body. At both trials McMillan positively identified these defendants as his assailants. If that testi-

mony is true, it is a reasonable and logical deduction that the defendants also killed Mary McMillan.

Three witnesses for the State, near neighbors of the McMillans, and who were on the scene within a few minutes after hearing the noise of the encounter, testified that they found McMillan under his house. While removing him from under the house, these witnesses asked McMillan who had attacked him. He said that his assailants were three foreigners who spoke broken English; that their identity was unknown to him and that they had escaped in an automobile. It appears by the record that Troop and Stevens are Americans. Whether or not Shaffer is an American does not plainly appear. None of these State witnesses saw an automobile leaving the scene, although they were awakened by the noise of the encounter, and immediately looked in that direction, some of them having an unobstructed view of the premises. Amongst the witnesses for the defense was a deputy sheriff, who testified that he was on the scene at about 5:25 A. M., other testimony indicating that the murder was committed about 5 o'clock. This deputy sheriff testified that he found McMillan under the house, that his mind appeared to be clear, and that McMillan told him three foreigners "chopped him up like a rabbit." A police officer of the City of Jacksonville who arrived at practically the same time, testified to the same statement by McMillan.

Soon after the arrival of the neighbors, McMillan was taken to a hospital where he was treated. One of the doctors who attended him there testified for the defense that McMillan's mind was clear and that he was rational on the afternoon of August 1st, the day he was brought to the hospital. Another doctor who was attending him at the hospital testified that he talked to McMillan on the afternoon of August 2nd; that his mind appeared to be clear,

and that McMillan told him he was attacked by a masked band of men about 4 o'clock A. M. on the morning in question. The defense testimony further shows that on the second or third day McMillan was in the hospital he was visited by two police officers who were endeavoring to ascertain the identity of the perpetrators of the crime. At that time McMillan told one of the officers that he did not know who had attacked him—whether they were white or black. On the same day he told the other officer he did not know who attacked him, that he would not know them. This officer saw McMillan again the next day, and had about the same conversation with him. McMillan again said he did not know who his assailants were. The same officer saw McMillan again two or three days later, after these defendants had been arrested and were in jail. The officers asked McMillan if it could be these defendants who had attacked him. McMillan said he did not know; that he had had no difficulties with them. As the officer was leaving, however, McMillan said that he, the officer, ''might hold these men.'' To another officer who visited him on the fourth day after his admission to the hospital, McMillan stated that he did not know who his assailants were; that whoever it was talked in a foreign brogue. This officer asked McMillan if it could have been the defendant Troop, to which McMillan replied in the negative.

Another reputable doctor examined McMillan at the hospital on August 10th. This doctor testified that McMillan's mind was clear and that he was rational; that he asked McMillan the identity of his assailants, whereupon McMillan replied in substance that he was ''struck by a couple of people who looked like foreigners and talked like foreigners, or talked in broken English.''

Another witness, a woman, who visited McMillan in the hospital during the latter part of August had a somewhat

extended conversation with him concerning the crime, during which she testifies that McMillan told her that when he was struck the blood was so thick in his eyes he could not see who did it.

There is evidence in the record to indicate that McMillan first undertook to identify these defendants as his assailants about eleven days after the crime. At a hearing held on September 1, 1926, upon a writ of *habeas corpus* sued out by these defendants, McMillan identified them as his assailants. We find in the record no corroboration of McMillan's identification of these defendants, nor any testimony, other than McMillan's that would tend to connect them with the crime, with the possible exception of the testimony of two witnesses, one of whom testified to the effect that about two months before the homicide he was standing down the street talking to the defendant Troop when Mrs. McMillan passed, whereupon Troop referred to her in uncomplimentary terms, stating that she meddled in other people's business and should be whipped, which statement Troop denies. The other witness testified that he was driving along a public street about three and one-half blocks from the scene of the crime, and about one-half hour or an hour after the crime was committed, and saw the defendant Shaffer, accompanied by another man whom the witness did not know, passing along the street in an ordinary manner and walking in a direction away from the McMillan home. There is testimony that this defendant lived in that general neighborhood at the time.

At the time of the homicide, McMillan and his wife were renting the home in which they lived from the defendant Troop. Troop lived a short distance away. Two of the State's witnesses who were neighbors of the McMillans testified that when they arrived on the scene and found what had happened they immediately went to Troop's house

to use his telephone to report the crime to the authorities. The testimony indicates that no more than twenty or thirty minutes had elapsed between the perpetration of the crime and the arrival of these neighbors at Troop's home. These witnesses found Troop at home, and apparently with his night clothes or underclothes on. Troop responded to their call and his daughter telephoned the message to the police authorities. Troop dressed and accompanied these witnesses to the scene of the crime, where he remained for a few minutes with the others who were there, after which he went in his automobile to the home of a deputy sheriff nearby, brought the deputy to the scene of the crime, and upon the deputy's directions, went to a prison camp nearby and brought bloodhounds to the scene. Two efforts were made to have the dogs find a track. The dogs ran a track off into a nearby railroad yard and then lost it. They did not go in the direction of Troop's home. Troop testified on the stand that he was at home the entire night preceding the murder. Some four or five witnesses were introduced by the State who testified Troop had told them on the day of the crime that he had been out practically all night before helping to run down some escaped convicts. The three defendants were arrested on the fourth day after the crime. Each of them was found going about his usual pursuits in Jacksonville.

The absence of motive on the part of these defendants as shown by the testimony is striking. Troop was McMillan's landlord and neighbor. McMillan himself for several days after the crime stated that he and Troop were on friendly terms and that Troop could not be the perpetrator of the crime; McMillan also testified that he knew the defendants Stevens and Shaffer very slightly, and had had no trouble with any of them. McMillan testified that he was buying milk from the Troop family just before time of the

homicide, and that the two families occasionally visited each other. There is also competent testimony that McMillan was addicted to the excessive use of liquor and drugs, and when under the influence of same frequently grew violent. There is also credible testimony that McMillan had several times threatened to attack his wife when intoxicated, and on one occasion threatened to attack her with an axe.

It is a well established general rule in this Court that when the propriety of a verdict depends upon the credibility of conflicting testimony, and when the facts in evidence are complicated or contradictory, requiring a consideration of the character, integrity or probity of witnesses whose testimony it is necessary to compare and weigh, the verdict of the jury will not be set aside as against the weight of the evidence unless the evidence preponderates so strongly against the verdict that the Court can not conclude that such verdict was the result of a due consideration of the evidence.

Exceptions to this rule, however, have been previously recognized by this Court in criminal cases where the evidence as to the identification of the accused as being the guilty party, or the evidence relied upon to establish some essential element of the offense, was not satisfactory. See Nims v. State, 70 Fla. 530, 70 So. R. 565; Fuller v. State, 110 So. R. 528; Ming v. State, 89 Fla. 280, 103 So. R. 618; Platt v. State, 65 Fla. 253, 61 So. R. 502; Davis v. State, 76 Fla. 179, 79 So. R. 450; Towsend v. State, 116 So. R. 7; Coker v. State, 83 Fla. 672, 93 So. R. 176; Knowles v. State, 89 Fla. 490, 97 So. R. 716; Davis v. State, 76 Fla. 179, 79 So. R. 450.

By what is said herein we neither hold nor infer that Mc-Millan's testimony as to the identity of these defendants must finally and conclusively yield to the contradictory testimony interposed against it.

This Court is very reluctant to interfere with the verdict of a jury upon conflicting facts, particularly so when the same verdict has been found on those facts by two juries. It is to be admitted that McMillan positively identifies these defendants as the guilty persons. It is also true that Mc-Millan denies the contradictory statements attributed to him by the defense witnesses. In view, however, of an apparent total lack of motive on the part of these defendants so far as this testimony discloses; in view of the many self-contradictory statements upon the question of identity imputed to McMillan by such an impressive array of apparently credible and disinterested witnesses, which this court can not wholly ignore when the essential fact of identity rests solely upon the testimony of that witness; and in view of the fact that three human lives are at stake upon the correctness of the conclusion reached upon that question, the Court, after due consideration of the evidence, is of the opinion that the evidence upon the essential issue of identity, taken as a whole, and considered in the light of the countervailing testimony on that question, is such that the ends of justice would be best subserved by allowing another jury to consider the issue.

The judgment is therefore reversed and the cause remanded for a new trial.

WHITFIELD, P. J., AND BUFORD, J., concur.

TERRELL, C. J., AND BROWN, J., concur in the opinion and judgment.

ELLIS, J., dissents.