DEWEY MATHIS and OSBORNE MATHIS v. STATE.

163 So. 479.
Opinion Filed October 15, 1935.

*C. A. Avriett,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Roy Campbell,* Assistant, for the State.

BROWN, J.—It is vitally important that our criminal laws be thoroughly enforced and that judgments of conviction should not be lightly set aside. But it is likewise true, as

was said by Mr. Justice BUFORD in Heath v. State, 97 Fla. 330, 120 So. 846, that "human liberty should not be forfeited by a conviction upon evidence which is not sufficient to convince a fair and impartial mind of the guilt of the accused to a moral certainty and beyond a reasonable doubt." The conflict in testimony in this case on the question of personal identity of the accused persons and their presence in the locality where the crime was committed is somewhat like that in the case quoted from, which resulted in a reversal, with the exception that in this case the evidence in favor of the defendants was much stronger.

In the case of Fuller v. State, 92 Fla. 873, 110 So. 528, Mr. Justice STRUM, speaking for this Court, said:

"In considering this case, we are mindful of the oft repeated rule that in criminal prosecution, a verdict of guilty will not ordinarily be disturbed upon the ground of the insufficiency of evidence, where there is some evidence from which all the elements of the crime may have been legally found or inferred, and it does not appear that the jury was not governed by the evidence adduced at the trial. Exceptions to this rule, however, have been previously recognized by this Court in criminal cases where the evidence as to the identity of the accused as being the guilty party was not satisfactory, and also where the verdict was not in accord with the manifest justice of the case. See: Platt v. State, 65 Fla. 253, 61 South. Rep. 502; Nims v. State, 70 South. Rep. 565; Davis v. State, 76 Fla. 179 South. Rep. 450; Ming v. State, 89 Fla. 280, 103 South. Rep. 618."

To like effect, see Troop v. State, 98 Fla. 385, 123 Sou. 811, and Clark v. State, 98 Fla. 874, 124 So. 446, a case where the defendant relied upon proof of an alibi as his defense. In that case, this Court, again speaking through Mr. Justice BUFORD, said:

"When we take into consideration our knowledge of men and affairs and realize how easily one may be mistaken as to the identity of another, even when he has some slight acquaintance with such other, and in connection with that consider the fact that in this case the person who is alleged to have been robbed had opportunity to see and observe the robber only during that interval of time when the robber had a gun shoved against his stomach and was demanding his money and consider the further probability that under such conditions the person being robbed was in a state of some excitement and not entirely composed, we think it would probably mean a miscarriage of justice for a conviction to stand based upon the evidence of such person alone as to identity in a case where the evidence shows that five disinterested and unimpeached witnesses testified that the defendant was at a place some six or eight miles away from the scene of the robbery when the robbery was committed. In such a case, although the Court is reluctant to interfere with the verdict of a jury based on the facts, justice demands that a new trial be granted. Kilcrease v. State, 117 So. R. 862."

The Kilcrease case, cited in the case quoted from, was somewhat like the present case in these respects, and the judgment of conviction was reversed, though the evidence supporting the alibi was not so strong as here. Indeed, the proof of the alibi presented in behalf of these plaintiffs in error in the court below was unusually strong and convincing.

See also Williams v. State, 100 Fla. 814, 130 So. 456, where, after commenting on the evidence, Mr. Justice TERRELL said that the "ends of justice require that the case be reversed and a new trial awarded." This observation is applicable in the instant case.

Here we have a case where J. B. Cobb, manager of the Suwannee grocery store located in the northern part of Lake City, Columbia County, Florida, was robbed by two men on Saturday night, July 1st, 1933. Mr. Cobb had closed his store about 12 o'clock that night and was walking to his home, which was some two blocks from the store, and had almost reached his home about five minutes later, when the robbery occurred. Before leaving his store, he had placed about $360.00 in currency and $42.00 in checks in a small bag which he put in his bosom. When almost home he was suddenly held up by two men, one a little taller than the other, one of whom pointed a pistol at him while the other grabbed him. They demanded his money. A short struggle ensued; Cobb fell, they grabbed the sack containing the money, and disappeared down an alley. Cobb said he had never seen the men before so far as he knew, and did not notice how they were dressed. The moon was shining; how brightly the evidence does not disclose. Plaintiffs in error, Dewey Mathis and his brother, Osborne, lived in Nashville, Berrien County, Georgia, some ninety-two miles from Lake City. They were arrested in Nashville early Monday morning, two days after the robbery in Lake City, and placed in jail. Cobb went up there with an officer that same day, and after looking at the two young men through an aperture about 10 inches square in the metal door of the old-fashioned jail, decided that they were the men who had robbed him, and so testified on the stand.

It appears that these young men had been in business in Lake City for a brief period before this robbery took place, but had gone out of business and returned to their home town in Georgia several months before the robbery. Cobb had never made their acquaintance. The State placed on the stand seven witnesses, residents of Lake City, who tes-

tified that they saw these boys in Lake City, at different times during the latter part of the week, and several of whom testified that they saw them there on Saturday night. One of them testified that these young men were in his barber shop, near Mr. Cobb's store, between nine and ten o'clock on Saturday night, and another claimed that he saw a man afterwards pointed out to him in jail as Dewey Mathis, walk by Cobb's store three times just a few minutes before Cobb closed the store; that he had never seen him before that night, but recognized him when he saw him in the jail in Nashville.

On the other hand, the defendants stoutly maintained that they were in Nashville, Georgia, all of Saturday and Saturday night and knew nothing at all about the robbery. That the last time they were in Lake City was on Wednesday, when they ran down on business. Their father, a farmer living about two miles from Nashville, said the boys worked with him on the farm all day Saturday. The boys went to town Saturday night, Osborne to his father-in-law's home, where he and his wife lived, his wife being quite sick in bed at the time, and stayed there with his wife all night, while Dewey spent the evening on the streets and visiting some of the stores of the town, getting a shave at the barber shop, and going back to his father's home after eleven o'clock. The friend who drove him out home in his car testified to that fact. This friend was Mr. K. M. Miller, hardware merchant and large farmer, of Nashville. Mr. Miller testified that he closed his store at 11:15 that night and walked out to his car, and Dewey Mathis and his brother, Ralph, who worked for Miller, were there, and he drove them out to their father's place. Mr. and Mrs. Mathis testified that they had attended a church meeting that night and invited the minister to spend the night at their home,

and that when they got home at twelve o'clock or a little thereafter Dewey had already gone to bed on one of the beds in the room they took the minister into. The minister, Rev. W. R. Griffin, said that Dewey was in bed, but still awake, and that they smoked and chatted together for awhile before the minister himself retired and went to sleep on the other bed in the same room with Dewey. Osborne's presence that night at his father-in-law's home with his sick wife was proven by the testimony of members of the family, and corroborated by that of other witnesses. In addition to the members of the respective families, the whereabouts of these two young men on the Saturday night in question was thoroughly and satisfactorily accounted for by the testimony of fifteen disinterested citizens of Nashville, of various walks in life, some of them prominent in the community, and all of whom testified with evident frankness and candor. Their testimony was not shaken by cross examination, nor was it impeached in any way. Nashville and Lake City were both on Eastern Standard Time. These boys were raised in Nashville, Georgia, and the fifteen witnesses who saw and talked with them in Nashville on that Saturday night had known them practically all their lives and could not have been mistaken as to their personal identity, whereas the witnesses for the State were residents of Lake City, and had only a very short and casual acquaintance with the defendants, and could more easily have been mistaken in this regard. The State's witness who appears to have had the best opportunity of really knowing these defendants was a young lady who worked in the Seminole Restaurant in Lake City. She said that she was not intimately acquainted with them, but she had roomed for a short while at the same rooming house where they had a room when they were working in Lake City, and that she saw them

walk by the restaurant at one o'clock on that Saturday afternoon; did not speak to them, but merely saw them pass. Giving the State's witnesses full credit for good faith and veracity, the fact remains that the witnesses who had known these boys practically all their lives were in a much better position to testify positively as to their identity than the witnesses for the prosecution.

None of the stolen money or checks was shown to have been traced to these defendants. They had no money on their persons when arrested except a negligible amount of small change.

The State's witnesses could easily have been honestly mistaken as to the identity of the men that they saw that Saturday night in Lake City and thought to be Dewey and Osborne Mathis. But not so with the witnesses for the defendants. If they did not see and talk with these young men on that Saturday night in Nashville, as they said they did, they committed downright and willful perjury. If, on the other hand, they told the truth, as their testimony indicates, standing as it does entirely unimpeached, these young men could not have been in Lake City when this robbery was committed, and they were and are innocent of the charge of armed robbery for which they were indicted and convicted. For some reason, not disclosed by the record, the jury unwarrantably disregarded the positive testimony of these twenty or more witnesses from Nashville, fifteen of whom were disinterested and not related to the defendants.

In the light of our previous decisions hereinabove cited, we conclude that the trial court was in error in denying the motion for new trial. That the trial judge himself must have had some doubt of the guilt of these defendants is indicated by the extremely light sentences imposed. Much as we regret to set aside the verdict of a jury on conflicting

testimony, the evidence is far from satisfactory as to the identity of the defendants as being the guilty parties, and this case falls within the exception to the general rule above pointed out. So the applicable rules of law and the demands of justice require that the judgment of conviction be, and the same hereby is, reversed and remanded.

Reversed and remanded.

WHITFIELD, C. J., and TERRELL, BUFORD and DAVIS, J. J., concur.