337 So.2d 788 (1976)
Delbert TIBBS, a/k/a Delbert Johnson, Appellant,
v.
STATE of Florida, Appellee.
No. 47258.
Supreme Court of Florida.
July 28, 1976.
Rehearing Denied September 28, 1976.
*789 George C. Howard, of Howard & Mann, Chicago, Ill., for appellant.
Robert L. Shevin, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., for appellee.
ENGLAND, Justice.
This cause is before us on direct appeal to review the convictions of Delbert Tibbs for rape and murder in the first degree. Tibbs was sentenced to life imprisonment and to death, respectively. We have jurisdiction under Article V, Section 3(b)(1) of the Florida Constitution, and Section 921.141, Florida Statutes (1975).
Tibbs was charged in a three count indictment with the rape of Cynthia Nadeau, the premeditated murder of Terry R. Milroy, and the crime of felony murder for killing Milroy while raping Nadeau. A jury trial was held which resulted in conviction for rape and first degree murder. A death sentence was recommended by the jury for murder, and the trial judge imposed the death penalty for that crime.
The relevant facts of the alleged crime, as brought out on trial, were these. Nadeau and Milroy were hitchhiking to Marathon from St. Petersburg, when they were picked up in Fort Myers by a man alleged to be driving a green truck with a rounded hood, black vinyl seats, no door handle, and an oil light that blinked on and off. This man drove into a field, stopped the truck, got out of the truck with Milroy and requested that Milroy give him a hand. After a minute or so passed, Nadeau got out of the truck and went around to the back of the truck where the driver was holding a gun on Milroy. As he held the gun on Milroy, he commanded Nadeau to undress. He then shot Milroy and walked over to where Milroy lay. Milroy pleaded with the driver not to kill him, but the man shot him again, inflicting the fatal wound. The driver then proceeded to rape Nadeau. Thereafter, she was ordered to dress and get back in the truck. Upon reaching the highway, she was ordered to get out and walk in front of the truck. She left the truck, but was able to run and successfully escape.
Tibbs' principal contention to this Court is that the totality of evidence at trial was insufficient to place him at or near the scene of the murder and rape at the time they occurred, or to establish his identity as the perpetrator beyond all reasonable doubt. Specifically he states that there is no evidence to corroborate the testimony of Cynthia Nadeau, the 17-year old rape victim, and that her testimony is so *790 riddled with conflicts and is so inherently unreliable that his conviction and attendant death sentence should be reversed. Tibbs also contends, and we agree after reading the transcript, that no credence can be given to the testimony of Tibbs' Lee County jailmate, serving a life sentence for rape, to the effect that Tibbs confessed to the crime. This testimony appears to be the product of purely selfish considerations.
Under Section 921.141(4), Florida Statutes (1975), and Fla.App. Rule 6.16(b), it is our obligation to review a conviction for which the death sentence has been imposed to determine if the interests of justice require a new trial. Our review of the record of this proceeding leaves us with considerable doubt that Delbert Tibbs is the man who committed the crimes for which he has been convicted. Since the principal testimonial evidence against Tibbs came from Nadeau, we begin with the legal rules governing its reliability.
The law in Florida appears well established to the effect that no corroborative evidence is required in a rape case when the victim can testify directly to the crime and identify her assailant. Thomas v. State, 167 So.2d 309 (Fla. 1964). Obviously this rule also applies to the rape-murder crimes with which Tibbs was charged. The policy reasons for this rule are sufficiently apparent that they need not be reiterated or re-examined here. The limitation to its application, however, is "that where the sole witness is the prosecutrix, her testimony must be carefully scrutinized so as to avoid an unmerited conviction." Thomas, above, at 310.
In this case, we find the following infirmities in the evidence establishing Tibbs as the perpetrator of these crimes:
(1) Except for the testimony of Nadeau, not one shred of evidence was developed to place Tibbs in the Ft. Myers area at any time, let alone on or near February 3, 1974, the date of the crimes. Admittedly Tibbs was not a public or social figure who would have made acquaintances or attracted attention, but with the publicity attending the crimes and the discovery methods available to the state, surely someone might have been found who could (at least tentatively) have identified Tibbs as having come to Ft. Myers, eaten in Ft. Myers, passed through Ft. Myers, or at least been seen walking or riding in Ft. Myers. No such person was brought forward, and only Cynthia Nadeau's testimony puts this man in that area of Florida. In contrast, undisputed evidence established Tibbs' presence in Daytona Beach on the night of February 1 and the morning of February 2, in Leesburg on February 6, and in Ocala on February 7. Except Nadeau's testimony, there is no evidence to place Tibbs in the southwest corner of the state during this five day interval.[1]
(2) No trace was ever found of the truck which Nadeau stated was driven by Tibbs when she and Milroy were picked up in Ft. Myers and taken to the scene of the crimes. Despite her specific testimony as to the color of the truck, its type and its special characteristics (no right door handle, rounded hood, blinking oil light), and the additional fact that her description was given to the police within an hour of Milroy's death and her alleged rape, the police were unable to locate any vehicle like the one she described despite an exhaustive car and helicopter search of the area. This fact can be evaluated against the uncontroverted evidence that Tibbs was on the other side of Florida, in Daytona Beach, the morning of the day before the crimes and at that time possessed no vehicle for his use.
(3) No gun or car keys were ever found in Tibbs' possession, at the scene of the crime, or elsewhere. When Tibbs was *791 stopped by police officers in Florida and Mississippi (February 6 in Leesburg, February 7 in Ocala, and March 13 in Clarksdale, Mississippi) he was afoot, and there was no evidence that he had either owned or operated a motor vehicle.
(4) On the three occasions when Tibbs was stopped by police on the basis of the description issued by Nadeau, he cooperated fully with the officers by providing all information and identification they requested, by allowing himself to be photographed, and on the last occasion by waiving extradition in Mississippi to voluntarily return to Florida to face rape and murder charges in Ft. Myers.
(5) No evidence was introduced which casts doubt on Tibbs' veracity. He did not have a previous criminal record and he had never been arrested, except possibly for a traffic violation. Evidence was introduced from people in his home town, including a minister and elected state officials, that he was a law-abiding citizen.
(6) Several features of Nadeau's testimony, when considered with other evidence in the record independently established and uncontroverted, cast doubt on her believability. For one, despite her assertions that adequate daylight was present at the time of the alleged crimes to impress Tibbs' features and characteristics into her mind, all independent evidence of the events indicates that the crimes occurred after nightfall. For another, her admitted use of marijuana throughout the day and immediately prior to the crimes casts doubt on her identification of Tibbs. Thirdly, the manner in which Tibbs was first identified ten days after the crimes, by bringing Nadeau to Ft. Myers from St. Petersburg after she had reestablished herself in that community, in order to see three photographs of Tibbs, suggests a less reliable identification than would have been possible with multiple photographs of more than one person.
We recognize that the resolution of factual issues in a criminal trial is peculiarly within the province of a jury, but in this case a man's life has been placed in jeopardy and the Florida Legislature has directed that we review the "entire record". Our obligation now is no less than it was when Odie McNeil was sentenced to life imprisonment in 1932 and this Court said:
"Human liberty should not be forfeited by a conviction under evidence which is not sufficient to convince a fair and impartial mind of the guilt of the accused beyond a reasonable doubt. This is especially true in a case where life imprisonment is the penalty imposed. Heath v. State, [97 Fla. 330, 120 So. 846] supra. And where the evidence of identity of the accused as being the guilty party is not satisfactory to the appellate court, a new trial will be granted. Nims v. State, [70 Fla. 530, 70 So. 565] supra.
In this case the sole testimony identifying the defendant McNeil as a participant in the robbery was given by the witness Rahming... .
While the weight of the evidence and the credibility of the witnesses is ordinarily a matter which is exclusively within the province of the jury to decide, and this court will as a rule not reverse a judgment based upon a verdict returned by the jury and approved by the trial judge, when there is substantial evidence to support the verdict rendered, it is also the rule that the evidence relied on to have this effect must be substantial in character.
When such evidence is not substantial in character, this court is committed to the rule that a conviction will be reversed and a new trial ordered, where the evidence relied on is not satisfactory to establish the identity of an accused as a participant in a crime of which he has been found guilty." McNeil v. State, 104 Fla. 360, 139 So. 791, 792 (1932).
Rather than risk the very real possibility that Tibbs had nothing to do with these crimes, we reverse his conviction and remand for a new trial.
SUNDBERG and HATCHETT, JJ., concur.
BOYD, J., concurs specially with an opinion.
*792 ROBERTS, J., dissents with an opinion.
OVERTON, C.J., and ADKINS, J., dissent and concur with ROBERTS, J.
BOYD, Justice (concurring specially).
I concur in the majority opinion by Justice England vacating the conviction and sentence and requiring a new trial. I base this conclusion upon the weakness and inadequacy of the testimony against appellant given in the trial court.
In each instance before the death penalty may be imposed under Florida law this Court, far from the scenes of the crimes and pressures of the trial court proceedings, and with clinical objectivity, evaluates the record. We must determine whether such convicted persons are to be executed, imprisoned or set free.
Under Anglo-American standards of criminal justice the record in this case does not, in my judgment, support the imposition of either capital punishment or imprisonment.
In the case of Griffis v. Hill, 230 So.2d 143 (Fla. 1969) this Court held that:
"The test to be applied in determining the adequacy of a verdict is whether a jury of reasonable men could have returned that verdict."
The major corroborating witness for the State is a convicted rapist who admitted under oath in this trial proceeding that he had testified falsely under oath in connection with his prior trial relating to his guilt and his ability to pay legal counsel. The witness testified that he was angered because a state investigator had accused him of being a liar and at first refused to consider the testimony which he wanted to give against appellant to the effect that appellant had made an admission of guilt to him while they were in jail together. It should have been obvious that the witness was attempting by his testimony to benefit himself in connection with his own imprisonment. The eyewitness testimony of the rape victim is the only testimony having any merit whatever, but it is not supported by even the slightest additional testimony placing appellant within 150 miles of the scene of the crime when it occurred. The mysterious truck in which the rape victim testified she and her attacker had smoked marijuana cigarettes could never be found, although the other convicted rapist claimed that appellant had told him the truck had been abandoned when it ran out of gas between Fort Myers and Miami. The testimony further shows that on the fateful day of the crimes, the rape victim had smoked marijuana cigarettes on several occasions during the day and was under the influence of marijuana at the time the crimes were committed. Immediately after the crime she resumed her status as the "common law wife" of the man whom she had deserted in St. Petersburg when she eloped with the murder victim. Although she personally identified appellant from pictures, in a lineup and at trial, the testimony given by the rape victim immediately after the crime gave a description of a ruffian whose language, personality and physical appearance conflicted substantially with that of the appellant who was identified at the trial by Chicago public officials and professional people as having a good reputation and being a law abiding citizen.
Although the weakness of the evidence presented in the trial court might well require that the appellant be released from incarceration without further litigation, it is my understanding that Florida law permits a new trial and I, therefore, reluctantly concur in the majority opinion providing for such new trial.
ROBERTS, Justice (dissenting).
I must respectfully dissent.
Appellant was charged in a three count indictment with rape in that he did unlawfully and feloniously ravish and carnally know a female of more than ten years of age, to-wit: Cynthia Nadeau, by force and against her will; with murder in the first degree in that he did unlawfully, feloniously and from a premeditated design to effect the death of Terry R. Milroy, did shoot Milroy with a deadly weapon  a pistol  thereby inflicting a mortal wound from which Milroy died; and with felony murder *793 in that he did unlawfully and feloniously kill Milroy while perpetrating the rape of Cynthia Nadeau. The jury returned a verdict of guilty of rape, and guilty of murder in the first degree and recommended the death penalty. The trial court adjudicated him guilty of murder in the first degree and rape and sentenced him to consecutive sentences of death and life.
Hitchhiking to Marathon, Florida, from St. Petersburg, Cynthia Nadeau and Terry Milroy were picked up in Fort Myers by a man, identified as the defendant, driving a green truck with a rounded hood, black leather vinyl seats, no door handle, with the oil light going on and off. Defendant drove into a field, stopped the truck, got out of the truck with Milroy and requested that Milroy give him a hand. After a minute or so passed, Nadeau got out of the truck and went around to the back of the truck where defendant was holding a gun on Milroy. As he held the gun on Milroy, he commanded Nadeau to undress. He then shot Milroy and walked over to where Milroy lay, Milroy pleaded with defendant not to kill him, but defendant shot him again inflicting the mortal wound which caused Milroy's death. Defendant then proceeded to rape Nadeau. Thereafter, she was ordered to dress and get back in the truck. Upon reaching the highway, she was ordered by defendant to get out and walk in front of the truck. She did exit the truck but ran and successfully escaped.
Appellant has raised several points on appeal relating to the identification procedure employed by the State, the jury venire, testimony of the prosecutorial identifying witness, introduction into evidence of the polygraph test contained in the police report, alleged forgery of registration card at the Salvation Army Center in Orlando, alleged perjured testimony of the corroborating witness Tibbs, brief period of time in which jury deliberated before returning its verdict of guilty as charged, and the constitutionality of the death penalty.
Subsequent to the rape and murder, Nadeau gave a detailed description of her assailant. Because he fit the description, the defendant was stopped several times for questioning. Appellant explains that the complaining witness, having previously been unable to identify her assailant from photograph identification albums provided by the police, was presented with two photographs of the defendant whom she identified as her assailant. She later identified him in a four-man lineup and again at trial. Appellant argues that the photographic identification by Cynthia Nadeau who identified appellant as her assailant and the murderer of Milroy so tainted the subsequent lineup and trial identifications as to deprive him of due process of law because this procedure was so suggestive as to give rise to a real likelihood of irreparable misidentification.
The prosecutrix in Chaney v. State, 267 So.2d 65 (Fla. 1972), identified her assailant when presented with a single photograph of him by the Sheriff's deputy. Subsequently, she identified him from a lineup. Taking into consideration the circumstances surrounding the identification and the guidelines set out by the Supreme Court of the United States to ensure against misidentification, this Court held that the identification procedures employed were not so fatally tainted to deprive appellant of due process of law. Therein, this Court explained:
"Within the latitude of the particular facts of this case and taking them all into consideration, as we may do under the guidelines of the Supreme Court of the United States, it does not appear to us that the identification procedures employed herein were fatally tainted to the point of depriving Appellant of due process of law.
"It is true that a single photograph of Appellant was shown prosecutrix by the sheriff's deputy, because she told him Appellant had revealed to her he had been jailed for raping another girl. Pursuant to this revelation, it is logical that the police would show prosecutrix a photograph of a suspect in another rape case who had been jailed as a lead in identifying and arresting the person suspected of committing the crime of rape upon the prosecutrix. Under these circumstances, *794 it was not an abuse of due process rights to use the single photograph as a clue or lead in apprehending the rapist of prosecutrix. In fact, it would be unreasonable to preclude the use of such a photograph for this pre-arrest purpose.

"Moreover, the fact that prosecutrix had opportunity to see her assailant over a period of several hours, including daylight of the day succeeding his original attack upon her, is such an overwhelming circumstance of independent origin as to discount the suggestion that only through means of the photograph prosecutrix was able to identify Appellant. Corroborating latent fingerprints extracted from furnishings and items in the trailer where the rape occurred were identified as belonging to Appellant.
"We conclude that the totality of the particular circumstances of this case does not disclose that prosecutrix's identification of Appellant was fatally tainted to the point of denial of his rights of due process." (Emphasis supplied)
In Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), which involved a victim's identification of the defendant at a stationhouse showup which occurred seven months after the rape, the Supreme Court determined that, although the stationhouse identification may have been suggestive, under the totality of circumstances, the victim's identification was reliable and was properly allowed to go to the jury. First discussing the past precedent relative to the scope of due protection against the admission of evidence deriving from misidentification procedures,[1] the Supreme Court delineated guidelines to be considered relative to the relationship between suggestiveness and misidentification, as follows:
"It is, first of all, apparent that the primary evil to be avoided is `a very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U.S., at 384, 88 S.Ct., at 971. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of `irreparable' it serves equally well as a standard for the admissibility of testimony concerning *795 the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in Foster. [Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402.] Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as Stovall makes clear, the admission of evidence of a showup without more does not violate due process.
"What is less clear from our cases is whether, as intimated by the District Court, unnecessary suggestiveness alone requires the exclusion of evidence. While we are inclined to agree with the courts below that the police did not exhaust all possibilities in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process. Clemons v. United States, 133 U.S.App.D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (Leventhal, J., concurring); cf. Gilbert v. California, 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178 (1963); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Such a rule would have no place in the present case, since both the confrontation and the trial preceded Stovall v. Denno, supra, when we first gave notice that the suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury.
"We turn, then, to the central question, whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."
Upon consideration of these guidelines, the Supreme Court concluded:
"We find that the District Court's conclusions on the critical facts are unsupported by the record and clearly erroneous. The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough. She had `no doubt' that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation. The victim here, a practical nurse by profession, had an unusual opportunity to observe and identify her assailant. She testified at the habeas corpus hearing that there was something about his face `I don't think I could ever forget.' App. 127.
"There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases. Here, however, the testimony is undisputed that the victim made no previous identification at any of the showups, lineups, or photographic showings. Her record for reliability was thus a good one, as she had *796 previously resisted whatever suggestiveness inheres in a showup. Weighing all the factors, we find no substantial likelihood of misidentification. The evidence was properly allowed to go to the jury."
Applying the factors described in Neil v. Biggers, supra, appellee states that Nadeau's identification was reliable and was properly submitted to the jury. I agree.
Although appellant originally objected to the jury venire at the commencement of trial proceedings, he subsequently expressly withdrew the objection to the venire after the jury was selected. The following is reflected by the record:
"THE COURT: Mr. Howard, for the record, are you withdrawing your objection that you made yesterday?
"MR. HOWARD: Yes.
"MR. LONG: For the record, Mr. Howard, you are withdrawing the objection to the venire as it appeared in the courtroom as of yesterday?
"MR. HOWARD: Yes.
"MR. LONG: Thank you very much, Mr. Howard.
"THE COURT: Is the State ready to proceed?
"MR. LONG: Yes.
"THE COURT: Defense ready to proceed?
"MR. HOWARD: Yes."
Accordingly, appellant can not now complain of reversible error on this ground. In State v. Silva, 259 So.2d 153 (Fla. 1972), this Court held:
"Such an objection comes too late after verdict and has no place in a motion for new trial or in arrest of judgment. By going to trial before a jury without any objections, a defendant waives all irregularity in the drawing, summoning and impaneling of such jurors. Green v. State, 60 Fla. 22, 53 So. 610 (1910); Lake v. State, 100 Fla. 386, 129 So. 833 (1930); 14 F.L.P., Jury, § 111; 20 Fla.Jur., Juries, § 68."
Appellant contends that the introduction into evidence of the police report which included results of a polygraph test given to Miss Nadeau and other hearsay evidence was error. The defense used the police report extensively in cross-examination of a witness. Thereafter the State moved to introduce the report into evidence. The trial judge then specifically inquired of defense counsel whether there was any objection to the introduction of the report to which defense counsel responded that he had no objection. The following appears in the record:
"MR. LONG: Your Honor, at this time I would move to introduce the investigator's report into evidence that Mr. Wallace has been testifying from.
"MR. HOWARD: Well, excuse me. Judge, I don't want to argue the matter. May we approach the bench?
"THE COURT: You have seen it. Do you have any objection? If you have an objection then we will return the jury back to the jury room. That's what we usually do. Do you have any objection to it being introduced?
"MR. HOWARD: No, sir. That is all right.

"MR. LONG: Thank you.
"THE COURT: All right. Mr. Clerk, please mark the investigator's report into evidence carrying the same number." (Emphasis supplied)
The report was thereby stipulated into evidence. I find no reversible error as to this point. Cf. Codie v. State, 313 So.2d 754 (Fla. 1975); Woods v. State, 285 So.2d 650 (Fla.App. 3, 1973).
I have carefully considered the several other points on appeal presented by appellant and find none to be meritorious so as to constitute reversible error.
I have listened carefully to oral argument, examined and considered the record in light of the assignments of error and briefs filed, and I have also, pursuant to Rule 6.16(b), Florida Appellate Rules, reviewed the evidence to determine whether the interests of justice require a new trial, with the result that I find no reversible error is made to appear and the evidence in the record before us does not reveal that the ends of justice require that a new trial *797 be awarded. Cf. State v. Dixon, 283 So.2d 1 (Fla. 1973); Alford v. State, 307 So.2d 433 (Fla. 1974).
The jury recommended and the trial judge, upon considering all the mitigating and aggravating circumstances, agreed that the death penalty be imposed for the commission of this atrocious and heinous crime. I find that the judgment and sentence of the lower court in this cause is in accordance with the justice of the cause.
I, therefore, respectfully dissent.
OVERTON, C.J., and ADKINS, J., concur.
NOTES
[1] The state introduced records from the Orlando Salvation Army which would have placed Tibbs in that area on the night of February 4. Without passing on Tibbs' assertion that the signature on the card was not his (which a superficial comparison with his admitted signature on a like record from the Daytona Beach Salvation Army seems to bear out), Orlando is still the nearest place to Ft. Myers, geographically and in time, that the state was able to place him, except of course for Nadeau's testimony.
[1] "In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Court held that the defendant could claim that `the confrontation conducted ... was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.' Id., at 301-302, 87 S.Ct., at 1972. This, we held, must be determined `on the totality of the circumstances.'

We went on to find that on the facts of the case then before us, due process was not violated, emphasizing that the critical condition of the injured witness justified a showup in her hospital room. At trial, the witness, whose view of the suspect at the time of the crime was brief, testified to the out-of-court identification, as did several police officers present in her hospital room, and also made an in-court identification.
"Subsequently, in a case where the witnesses made in-court identifications arguably stemming from previous exposure to a suggestive photographic array, the Court restated the governing test:
"`[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).
"Again we found the identification procedure to be supportable, relying both on the need for prompt utilization of other investigative leads and on the likelihood that the photographic identifications were reliable, the witnesses having viewed the bank robbers for periods of up to five minutes under good lighting conditions at the time of the robbery.
* * * * * *
"In the most recent case of Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), we held admissible an in-court identification by a witness who had a fleeting but `real good look' at his assailant in the headlights of a passing car. The witness testified at a pretrial suppression hearing that he identified one of the petitioners among the participants in the lineup before the police placed the participants in a formal line. Mr. Justice Brennan for four members of the Court stated that this evidence could support a finding that the in-court identification was `entirely based upon observations at the time of the assault and not at all induced by the conduct of the lineup.' 399 U.S., at 5-6, 90 S.Ct., at 2001."