379 So.2d 97 (1979)
Raymond Robert CLARK, Appellant,
v.
STATE of Florida, Appellee.
No. 52716.
Supreme Court of Florida.
November 21, 1979.
Rehearing Denied February 18, 1980.
*99 Jack O. Johnson, Public Defender, and James R. Wulchak, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen. and Richard G. Pippinger, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Raymond Robert Clark was adjudged guilty of murder in the first degree and was sentenced to death. His conviction and sentence of death are before this Court on direct appeal pursuant to article V, section 3(b)(1), Florida Constitution. Clark also appeals his convictions of kidnapping and extortion.
Clark raises several points on appeal which relate to his convictions. These include whether the trial court erred in denying his motion for a new trial on the basis that the verdict was contrary to the weight of the evidence; whether the trial court erred in denying his motion for a new trial on the basis of newly discovered evidence; whether the trial court committed reversible error in denying his motion to allow the jury to retire from deliberations where they had deliberated for a long period of time without a break; whether the trial court erroneously limited cross-examination of the State's key witness; whether error was committed when the State was permitted to elicit testimony relating to Clark's refusal to give voice exemplars and when the jury was instructed concerning Clark's refusal; whether it was error to deny Clark's motion to exclude the entire jury venire; whether the trial court erred in denying Clark's motion to exclude cameras from the courtroom; whether the court erred in not severing the extortion charge from the murder and kidnapping charges; and whether the court erred in denying Clark's motion for appointment of a certain psychologist. For the reasons which follow, we find that none of these issues have merit and, therefore, affirm the convictions. Clark raises five issues which relate to the sentencing phase of his trial. These are whether the court erred in denying Clark's motion for a statement of particulars of the aggravating circumstances on which the State would rely; whether a psychiatrist should have been appointed to assist him in establishing the mitigating circumstance of commission of the crime while under extreme mental or emotional disturbance; whether section 921.141, Florida Statutes (1975), restricts the mitigating circumstances to be considered; whether the trial court improperly doubled up certain aggravating circumstances; and whether the trial court erred in failing to find mitigating circumstances. We find merit only with his contention that the trial court erroneously doubled up aggravating circumstances; however, because we determine that the trial court correctly concluded that there are no mitigating circumstances, we hold that this error does not require reversal of the death sentence.
Raymond Clark first met his accomplice, Ty Johnston, in California when Johnston was fourteen years old and was living at a juvenile group home. Clark, who was then thirty-four, lived with Johnston in California for two years prior to the murder. He fed, clothed, and sheltered Johnston and introduced himself as Johnston's father, but, in fact, the pair had a homosexual relationship. Clark was the first and only person with whom Johnston had a homosexual relationship. Because the group home was being closed down and Johnston would have to move to a juvenile detention center, *100 Clark decided to take Johnston to St. Petersburg, Florida, where the two of them moved in with Clark's girl friend.
Because he was in need of money, Clark formulated a plan to kidnap someone at a bank and to demand money from that person. In furtherance of Clark's plan, on April 27, 1977, Clark and Johnston drove into several bank parking lots looking for a victim. Clark was armed with a .38 caliber pistol. They finally parked Clark's Chevrolet Blazer in the parking lot of a bank next to a white Cadillac and awaited the return of the owner of the Cadillac. The victim was a forty-nine-year-old businessman who had been to the bank to arrange a real estate closing. When he returned to his automobile, the victim was ordered by Clark to get into his own car. Clark then got into the passenger's side of the vehicle and ordered the victim to drive to several different locations in search of a deserted area. Johnston followed in Clark's Blazer. After an hour and a half of driving, the victim was finally directed to park his automobile in a secluded spot where he was ordered at gunpoint to get out of the vehicle. Clark commanded him to disrobe with the exception of his undershorts and then forced him to write a check on his personal account, payable to cash, in the amount of five thousand dollars. Clark proceeded to tie the victim's hands behind his back with wire and then asked Johnston whether he wanted to shoot the victim. Johnston replied that he did not. Clark then marched the victim into the bushes, made him kneel down, and shot him twice in the back of the head. When the victim's body was later found, his undershorts were down around his knees.
Clark, driving the Cadillac, and Johnston, driving the Blazer, drove back to Clark's girl friend's residence where they left the Blazer. They proceeded to the bank in the victim's Cadillac to cash the check. At the bank, Clark attempted to cash the check, but the teller refused. The Cadillac was then driven to a secluded location where Clark and Johnston wiped it down to eliminate any fingerprints.
Thereafter, concerned that he could face kidnapping charges for taking Johnston, a minor, from California, Clark drove Johnston back to California on the same day as the murder. Several days later Johnston went to live with his parents in California.
On May 9, 1977, before the victim's body had been found, Detective San Marco received a telephone call from a man, whom he testified sounded like Clark, inquiring as to the status of the police investigation relating to the disappearance of the victim. Thereafter, Clark made several threatening phone calls to the victim's son demanding ten thousand dollars for his father's safe return. In these phone calls, Clark described several items contained in the victim's car, including a V-neck tee shirt which he had used to wipe the fingerprints from the car and which had not been mentioned in newspaper accounts which had described the articles of clothing found in the victim's car. Several of these phone calls were traced to Clark's girl friend's residence. This residence had been placed under police surveillance. At the times the calls were made from this residence, there is evidence to place Clark in the residence, and at the time the calls were placed outside this home, there is evidence to show that Clark had gone out.
During the investigation of these extortion threats, the police developed the identity of Clark's accomplice, Ty Johnston, whom they brought back to Florida. Johnston described the kidnapping and murder and Clark's primary role in the incident and led the police to a wooded area where they found the victim's badly decomposed body lying face down in a patch of palmettos with two bullet wounds in the back of his head, with his hands wired behind his back, and with his undershorts down around his knees.
Clark was charged with first-degree premeditated murder, kidnapping and extortion. At trial, Ty Johnston described in detail Clark's role in the murder and kidnapping. Clark presented no defense. The jury returned a verdict of guilty on all three counts.
*101 Analogizing this case to Tibbs v. State, 337 So.2d 788 (Fla. 1976), Clark initially argues that the testimony of the State's key witness was unreliable and unworthy of belief and that the trial court erred in denying his motion for a new trial on this basis. He contends that the principal evidence against him came from a co-perpetrator, who had an interest in the outcome of the case, who lied to save himself, and who lied out of vindictiveness.
This case, however, is not at all analogous to Tibbs v. State wherein it appeared clearly from the record that the uncorroborated testimony of the victim of the crime was inherently unreliable. In Tibbs, the only identification witness was under the influence of marijuana at the time of the crime and had never seen the defendant before the day of the crime; there was a real question as to the identification procedure first used by the police; the vehicle connected with the crime was never found; there were discrepancies in the testimony of the State's witness relating to material elements of the case; and Tibbs put on a defense. The features, which we found cast doubt on the believability of the victim in Tibbs, are not present in this case.
The weight of the evidence is ordinarily a matter which falls within the exclusive province of the jury to decide, and we will not reverse a judgment based upon a verdict returned by a jury when there is competent evidence which is also substantial in character to support the jury's verdict. Tibbs v. State; McNeil v. State, 104 Fla. 360, 139 So. 791 (1932).
There are no discrepancies in the essential facts of Johnston's testimony. There is no question as to the identification of Clark or the fact that Clark's Blazer was identified as being in the bank's parking lot at the precise time that the victim was abducted. The teller at the bank testified that when Clark put on his sunglasses, he looked like the person who attempted to cash the victim's check of five thousand dollars. She stated that the build of his face, his height, his weight, the hair on his arms, his beard, his long hair, and the way his glasses fit on his head looked like Clark's features. Detective San Marco testified that Clark's voice sounded the same as the voice of the person who had called him to see how the investigation of the case was developing. The jury found Johnston to be credible and believed his account of the essential elements of the crime. We hold that the trial court did not err in denying Clark's motion for a new trial on this ground since the record contains substantial credible evidence to support the jury verdict.
We also find no abuse of discretion in the trial court's denial of Clark's motion for new trial based upon an alleged discovery of new evidence: a letter from a former cell mate of Johnston's stating that Johnston had told him that he had shot the victim. A motion for new trial based on newly discovered evidence is addressed to the sound discretion of the trial court, and only very rarely will its determination be disturbed. Baker v. State, 336 So.2d 364 (Fla. 1976); Bell v. State, 90 So.2d 704 (Fla. 1956). A new trial will not be awarded on the basis of newly discovered evidence unless the evidence was discovered after trial, unless due diligence was exercised to have such evidence at the former trial, unless the evidence goes to the merits of the cause and not merely to impeach a witness who testified, unless the evidence is not cumulative, and unless it is such that it probably would have changed the verdict. Harvey v. State, 87 So.2d 582 (Fla. 1956); McVeigh v. State, 73 So.2d 694 (Fla. 1954); Branch v. State, 96 Fla. 307, 118 So. 13 (1928); Hudson v. State, 353 So.2d 633 (Fla. 3d DCA 1977). The evidence upon which Clark relied to support his motion for a new trial, in reality, was not newly discovered evidence but rather was only a newly discovered witness. This evidence is of an inherently non-credible nature and merely goes to impeach the credibility of a witness. After considering the motion for a new trial, the trial court properly determined that Clark had information of a similar type available to him at the time of trial, but he elected not to present such evidence to the jury. The trial *102 court also stated that there has been no showing that Clark would use this witness for a similar type of testimony in a new trial and that, in fact, there was no likelihood he would use it. Since the defense had similar information at the time of trial, the trial court correctly did not consider the letter to be newly discovered evidence.
Clark also challenges the denial of his motion to allow the jury to retire from its deliberations. He contends that, because of the lengthy period of deliberation, he was denied a fair trial by an impartial jury, free from outside influences. After nine hours of jury deliberation, Clark requested the court to call the jury back and to permit them to return to their hotel for the evening. He renewed this motion two hours later. Expressing concern that to insert itself into jury deliberation at the times requested would be prejudicial to the defendant and the State because the jury could be at a very critical point in their deliberations, the court denied the first motion and further explained that there was nothing to indicate that the jurors were deadlocked or were not actively engaged in constructive deliberations or that they were tired and wanted to recess. In denying the second motion to recess the jury, the court expressed the view that it was fearful that, if it sent a note to the jury telling them they could break, they might take this as a subtle form of intimidation to arrive at a verdict more hastily than they normally would. The trial court did not abuse its discretion in denying these motions to recess. Clark has failed to demonstrate how he was denied a fair trial by an impartial jury on the basis of the length of time the jury deliberated.
Clark next suggests that the court erroneously limited his cross-examination of Johnston. Defense counsel asked the witness whether he had ever been treated by a psychiatrist or psychologist. The State objected that the testimony was irrelevant, and the trial court sustained the objection. Johnston's competence had not been made an issue. Although Clark contends that this constituted a curtailment of his inquiry into the credibility of a witness and violated his right of confrontation, he does not show how an affirmative answer to this inquiry would in any way affect the truth or falsity of Johnston's testimony. During oral argument, defense counsel conceded that he had no information as to what the psychiatrist's tests showed or how they would dispute Johnston's credibility. The most the jury could have done with an affirmative response to this question was to speculate or conjecture about Johnston's mental condition.
Although acknowledging that the results of the voice exemplar are admissible, Clark next claims that the trial court erred in permitting the State to elicit testimony relative to his refusal to give voice exemplars and in instructing the jury to give the evidence of refusal such weight and consideration as it deserved in light of all the evidence. This point is likewise without merit. Prior to trial, the State filed a motion to compel a voice exemplar on the basis that it had reasonable grounds to believe that certain tape recorded telephone conversations in evidence were made by Clark. The court ordered Clark to give a voice exemplar in the exact words used by the extortionist. Clark refused on the basis that the giving of a voice sample violated his fifth amendment rights, and he was held in contempt. Clark's privilege against self-incrimination would not have been violated by compelling him to speak the words spoken by the extortionist, and therefore his refusal to speak was not an exercise of this right. Since the fifth amendment offers no protection against compulsion to submit a voice exemplar and since it does not privilege refusal to submit, the admission of Clark's refusal into evidence was not error. See Joseph v. State, 316 So.2d 585 (Fla. 4th DCA 1975); Boyer v. State, 182 So.2d 19 (Fla. 4th DCA 1966); Higgins v. Wainwright, 424 F.2d 177 (5th Cir.1970), cert. denied, 400 U.S. 905, 91 S.Ct. 145, 27 L.Ed.2d 142 (1970). Furthermore, we find no error in the trial court's instruction to the jury pertaining to this refusal.
*103 Clark next argues that the trial court erred in not excluding the entire jury panel because some prospective jurors are automatically excluded by the clerk for illnesses or disabilities which he alleges do not constitute physical infirmities as required by section 40.01, Florida Statutes (1977).[1] To effectuate this statute, Pinellas County has compiled a list of illnesses and disabilities which may disqualify a potential juror from service. Clark maintains that the exclusion of these certain classes of people deprived him of a representative cross-section of the community. The trial court disagreed with Clark, found substantial compliance with the statute, and denied the motion for exclusion. We agree with the trial court and find no error in its ruling. There is no suggestion that the selection process in Pinellas County systematically and intentionally excludes any economic, social, religious, recial, political, or geographical group. See Reed v. State, 292 So.2d 7 (Fla. 1974), cert. denied, 419 U.S. 995, 95 S.Ct. 307, 42 L.Ed.2d 268 (1974); State v. Silva, 259 So.2d 153 (Fla. 1972).
Clark also made a motion to have the rule allowing cameras in the courtroom during his trial declared unconstitutional or, in the alternative, to have the trial court enter an order prohibiting the presence of cameras in the courtroom. This motion was denied. He contends that cameras in the courtroom are a per se deprivation of his due process rights. We find this contention to be without merit. In Re: Petition of Post-Newsweek Stations, Florida, for Change in Code of Judicial Conduct, 370 So.2d 764 (Fla. 1979). Additionally, Clark has failed to demonstrate any specific denial of due process resulting from the presence of cameras in the courtroom during his trial.
Acknowledging the great measure of discretion accorded trial judges on the question of severance and recognizing that some evidence relevant to the extortion charge would be admissible at trial on the murder and kidnapping charges, Clark asserts that the trial court erred in refusing to sever the extortion charge from the murder and kidnapping charges. We conclude that the trial court did not abuse its discretion in denying the motion for severance and that the consolidation of the offenses did not prejudice Clark's right to a fair trial. See Smith v. State, 365 So.2d 704 (Fla. 1978); Ashley v. State, 265 So.2d 685 (Fla. 1972).
Furthermore, the trial court did not err in denying Clark's request for appointment of a psychologist. Although refusing to move for a sanity inquisition and to comply with the requirements of Florida Rule of Criminal Procedure 3.210, Clark requested that the court appoint a particular psychologist to examine Clark and to test him to determine whether a possible defense of not guilty by reason of insanity exists and to make his report confidential and solely to Clark's counsel for his determination of whether or not to make sanity an issue at trial. By his motion, Clark was attempting to circumvent Florida Rule of Criminal Procedure 3.210.
In addition to reviewing the record in light of these alleged errors asserted by Clark, which we have determined to be without merit, we also have reviewed the evidence pursuant to Florida Appellate Rule 6.16 to determine whether the interests of justice require a new trial and conclude that no new trial is required. Accordingly, the convictions are affirmed.
We now consider Clark's challenges to the imposition of the death penalty. The jury recommended that the death penalty be imposed. In ordering that the death penalty be imposed, the trial court found no mitigating circumstances and found the following aggravating circumstances:
A. The Defendant, RAYMOND ROBERT CLARK, was previously convicted in *104 California of Murder in the First Degree, which carried a possible maximum sentence of death. The Defendant was sentenced to life imprisonment for the commission of that crime but was paroled after serving ten (10) years in the California prison system. At the time of the commission of the present homicide, he was on parole from California, but was in violation of that parole by being in Florida.
B. The murder in the present case was committed by the Defendant during the course of a robbery.
C. The victim in the instant case was killed in order to eliminate him as a witness to the robbery.
D. The murder was committed by the Defendant for pecuniary gain.
E. The murder was committed for the purpose of hindering enforcement of the robbery laws of this State.
F. The murder was committed by the Defendant in a cool, callous and heartless manner without mercy or compassion for the victim, and therefore, was an especially heinous, atrocious and cruel crime.
Clark challenges his sentence upon several grounds. His contention that he was entitled to a statement of particulars as to the aggravating circumstances upon which the State would rely and present evidence of to support its request for the death penalty is without merit. Menendez v. State, 368 So.2d 1278 (Fla. 1979). Furthermore, Clark's argument that Florida's death penalty statute restricts the mitigating circumstances which may be considered was recently dealt with in our decision in Songer v. State, 365 So.2d 696 (Fla. 1978), wherein we held that Florida's death penalty statute does not violate the eighth and fourteenth amendments to the Constitution of the United States since it does not limit the trial judge to consideration of only the statutorily enumerated mitigating circumstances.
Clark now claims that he was entitled to have a psychiatrist appointed to assist him in establishing the mitigating circumstance of commission of the murder while under extreme mental or emotional disturbance. A review of the record, however, reveals that no such request was made to the trial court, and the trial court was never given an opportunity to rule on whether Clark was entitled to a psychiatrist to assist him in the determination of mitigating circumstances. The motion for appointment of a psychiatrist only requested that a certain psychologist be appointed to examine Clark to determine if a possible defense of not guilty by reason of insanity was available to him.
The State concurs with Clark's contention that the trial court erroneously doubled up certain aggravating circumstances which this Court held was prohibited in Provence v. State, 337 So.2d 783 (Fla. 1976). We find that the trial court erred in finding as two separate aggravating circumstances that the murder was committed during a robbery and that the murder was committed for pecuniary gain and, in finding as two separate aggravating circumstances, that the victim was killed in order to eliminate him as a witness to the robbery and that the murder was committed to hinder law enforcement. Since we find that the trial court did not err in finding no mitigating circumstances, however, this defect in the trial court's order does not require resentencing. Hargrave v. State, 366 So.2d 1 (Fla. 1978); Elledge v. State, 346 So.2d 998 (Fla. 1977). Even with the elimination of the doubling-up of aggravating circumstances, there remain several aggravating circumstances to support the imposition of the death penalty. We find the death sentence to be warranted by the circumstances of this case.
Accordingly, having found no reversible error, we affirm the judgments and sentences.
It is so ordered.
ENGLAND, C.J., and ADKINS, BOYD, OVERTON, SUNDBERG and ALDERMAN, JJ., concur.
NOTES
[1] Section 40.01(3) provides:

In the selection of jury lists only such persons as the selecting officers know, or have reason to believe, are law abiding citizens of approved integrity, good character, sound judgment and intelligence, and who are not physically or mentally infirm, shall be selected for jury duty.